FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2017 NOV 20 P 3: 23

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. [UNDER SEAL] | ) ) ) **Case No. 1:17-CV-1327-CMH/TCB** |
| *Plaintiff,* | ) ) **Complaint for Violations of the False** |
| | ) **Claims Act, 31 U.S.C. §§ 3729,** *et seq.* |
| v. | ) ) **FILED UNDER SEAL** |
| [UNDER SEAL] | ) ) |
| *Defendants.* | ) **JURY TRIAL DEMANDED** ) ) |

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| -and- | ) |
| COMMONWEALTH OF VIRGINIA | ) |
| EX REL. CASSANDRA WHITAKER<br>618 Pensacola Avenue<br>Richmond, VA 23222 | ) Case No. _____ |
| *Plaintiff,* | ) **Complaint for Violations of the False**<br>**Claims Act, 31 U.S.C. §§ 3729, *et seq.*** |
| v. | ) **FILED UNDER SEAL** |
| LIFECARE MEDICAL TRANSPORTS, INC.<br>1170 International Parkway<br>Fredericksburg, VA 22406, | ) **JURY TRIAL DEMANDED** |
| KEVIN DILLARD<br>1170 International Parkway<br>Fredericksburg, VA 22406 | ) |
| DANIEL WILDMAN<br>1170 International Parkway<br>Fredericksburg, VA 22406 | ) |
| DOES 1-50 | ) |
| *Defendants.* | ) |

# INTRODUCTION

1.      *Qui tam* Relator Cassandra Whitaker ("Whitaker"), by her attorneys, individually

and on behalf of the United States of America, files this Complaint against Defendants LifeCare

Medical Transports, Inc. ("LifeCare"), Kevin Dillard ("Dillard"), Daniel Wildman ("Wildman"),

and DOES 1-50 (collectively, "Defendants") to recover damages, penalties, and attorneys' fees

for violations of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

2.      Defendants are Medicare and Medicaid providers and provide emergency and

non-emergency medical transport, including basic life support, advanced life support, specialty

care transport, and wheelchair van assistance.

3.      As discussed more fully below, Defendants are defrauding the U.S. Government

and taxpayers by billing Medicare and Medicaid for medical transports of patients that never

happened and medically unnecessary transports:

   a. According to Centers for Medicare and Medicaid Services ("CMS") data in 2014,

      Defendants received payments from Medicare totaling $5,489,088 that included

   b. $3,135,877 for A0428-Fs, a code for non-emergency medical transports, and

      $1,331,422 for mileage reimbursements;

   c. According to CMS data in 2013, Defendants received payments from Medicare

      totaling $4,501,204; and

   d. According to CMS data in 2012, Defendants received payments from Medicare

      totaling $3,984,295.

4.      In furtherance of their fraudulent schemes, Defendants keep false records to

support the false claims they submit to Medicare and Medicaid for payment while neglecting to

complete other required paperwork.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker
v. LifeCare Medical Transports, Inc., et al.*
3

5.      Defendants also threaten emergency medical technicians, including Whitaker, with retaliation if they do not cooperate with their fraudulent scheme.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants conduct business within this judicial district.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) because the illegal acts giving rise to this action occurred within this judicial district and because the Defendants conduct business within this judicial district.

## PARTIES

**Relator Cassandra Whitaker**

9.      Whitaker is a citizen of the United States and a resident of Virginia.

10.     Whitaker is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and states that her knowledge of the information contained herein has not been publically disclosed.

11.     Whitaker has been working for Defendants since January 2015 as an emergency medical technician.

12.     Whitaker is expected to graduate with an Associate of Applied Science in Emergency Medical Service from J. Sargent Reynolds Community College in Richmond, Virginia in 2017.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
4

**Defendant LifeCare Medical Transports, Inc.**

13.     LifeCare, which Dillard and Wildman formed and filed articles of incorporation

for in November 1993, is one of Virginia's largest medical transport providers today.

14.     Dillard serves as the president and Wildman as the vice president of LifeCare.

15.     Altogether, Defendants employ over 300 employees and is headquartered at 1170

International Parkway, Fredericksburg, Virginia 22406 with other Virginia facilities in

Arlington, Charlottesville, Richmond, Roanoke/Salem, Manassas, Newport News, and Norfolk.

16.     Defendants provide emergency and non-emergency medical transport, including

basic life support, advanced life support, specialty care transport, and wheelchair van assistance.

17.     In 2009, the Virginia Department of Medical Assistance Services determined

LifeCare received an overpayment of $367,178 from Medicaid.

18.     LifeCare's headquarters has a total assessed value of $2,195,900.

**Defendant Kevin Dillard**

19.     Dillard, who formed LifeCare along with Wildman in November 1993, is

president and listed by the Virginia State Corporation Commission as the registered agent of

LifeCare.

20.     Dillard is also president and listed by the Virginia State Corporation Commission

as the registered agent of both Rappahannock Emergency Medical Services Council, Inc., and

Virginia Ambulance Association, Inc.

21.     In addition, the Virginia State Corporation Commission lists Dillard as the

registered agent for DK Investments, LLC, Executive Properties, LLC, KLD Properties, LLC,

Medix Specialty Billing, LLC, and the now inactive Performance Specialty Vehicles, Inc.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
5

22.     Executive Properties, LLC was converted from Executive Properties, LP in January 2003.

23.     Executive Properties, LP was incorporated in Virginia in August 2000.

24.     The deeds for three of four Executive Properties, LP properties in Virginia, which have a total assessed value of $7,565,700, were transferred to Executive Properties, LLC in 2005, including LifeCare's headquarters.

25.     Dillard also owns four Virginia properties with a total estimated value of $510,711.

26.     In 1983, Dillard purchased property at 421 Laurel Avenue, Fredericksburg, Virginia 22408, which has a total assessed value of $189,000.

27.     In 1989, Dillard co-purchased property with Wildman at 6209 Massaponax Drive, Fredericksburg, Virginia 22407, which has a total assessed value of $118,500.

28.     In 1990, Dillard purchased property at 436 Rann Court, Fredericksburg, Virginia 22408, which has a total assessed value of $81,411.

29.     In 2011, Dillard purchased property at 5431 Alexander Drive, Roanoke, Virginia 24019, which has an assessed value of $121,800.

**Defendant Daniel Wildman**

30.     Wildman, who formed LifeCare along with Dillard in November 1993, is vice president of LifeCare.

31.     In 1989, Wildman co-purchased property with Dillard at 6209 Massaponax Drive, Fredericksburg, Virginia 22407, which has a total assessed value of $118,500.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
6

**Defendant DOES**

32.    Does 1-50 represent owners, operators, managers, and/or insurance companies for one or more defendants who are or may be liable for the claims alleged herein.

## BACKGROUND

### I.   Medicare Requirements

33.    In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C. §1395, *et seq.* ("The Medicare Program" or "Medicare") authorizing the Federal government to pay for the cost of certain medical services for persons aged 65 and older.

34.    The United States, through the Department of Health and Human Services ("HHS"), administers the Medicare program.  Part B of the Medicare Program is a federally subsidized health insurance system for disabled persons, blind persons, or persons who are 65 or older.  Eligible persons aged 65 and older may enroll in Part B of the Medicare Program to obtain benefits in return for payments of monthly premiums as established by HHS.  Part B covers, in general, 80 percent of reasonably charged services and items other than hospital expenses, and 100 percent of clinical diagnostic services.

35.    Medicare only pays medical transport companies for emergency and non-emergency medical transport of a beneficiary who is bed-confined and other methods of transportation contraindicated or if the medical transport is medically required.  42 C.F.R. § 410.40(d)(1) (2012).

36.    To be considered bed-confined, Medicare beneficiaries must either be "unable to get up from bed without assistance," "unable to ambulate," or "unable to sit in a chair or wheelchair."  42 C.F.R. § 410.40(d)(1)(i)–(iii) (2012).

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
7

37.    The following scenarios constitute medical necessity for medical transport according to the Medicare Benefit Policy Manual, Chapter 10 Section 20:

a.  The patient was transported in an emergency situation, for example, as a result of an accident, injury, or acute illness;

b.  The patient needed to be restrained in order to prevent injury to themselves or others;

c.  The patient was unconscious or in shock;

d.  The patient required oxygen or other emergency treatment during transport to the nearest appropriate facility;

e.  The patient exhibited signs and symptoms of acute respiratory distress or cardiac distress such as shortness of breath or chest pain;

f.  The patient exhibited signs and symptoms that indicate the possibility of acute stroke;

g.  The patient needed to remain immobile because of a fracture that had not been set or the possibility of a fracture;

h.  The patient could only be moved by stretcher; and/or

i.  The patient experienced severe hemorrhage or the patient was confined to a bed before and after the transport.

38.    There are two reasons for Medicare denial of medical transport:

a.  Lack of documentation to support the Medicare beneficiary's medical necessity for transport; or

b.  Lack of a signature of the beneficiary or that of a person authorized to sign the claim form on behalf of the beneficiary.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
8

39.     Medicare does not pay claims for the medical transport of a beneficiary that do not occur or if some means of transportation other than a medical transport service could be used without endangering the beneficiary's health, regardless of whether the other means of transportation is actually available.

40.     Before accepting Medicare assignments, Defendants, and all providers who submit claims for services provided to Medicare beneficiaries, must certify that it will operate in accordance with the requirements established by HHS

41.     At all times herein mentioned, Defendants had knowledge of the public policies expressed in the laws and regulations herein mentioned and of the fact that he must comply with all applicable Federal laws in order for the services Defendants perform to be approved for coverage under Medicare.

**II. Medicaid Requirements**

42.     Medicaid is a state run program that covers medical expenses for people with low or limited incomes.

43.     All states offer a variety of Medicaid programs that help Medicaid beneficiaries with Medicare costs.

44.     For services that both Medicare and Medicaid cover, Medicare pays first and Medicaid second by covering the remaining patient costs, such as Medicare co-insurances and co-payments.

45.     A portion of every state's Medicaid program, including Virginia's, is funded by the federal government.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker
v. LifeCare Medical Transports, Inc., et al.*
9

46.     The Virginia Department of Medical Assistance Services ("DMAS") is responsible for administering Medicaid in Virginia, including transportation services.

47.     DMAS transportation services include Emergency Air, Emergency Ground, Neonatal Ambulance, and Non-Emergency Medicaid Transportation services.

48.     The Non-Emergency Medicaid Transportation service is managed and operated by Virginia's statewide contracted transportation broker, LogistiCare.

49.     LogistiCare takes reservations for Medicaid beneficiaries, assigns trips to providers, and pays providers for all Non-Emergency Medicaid Transportation.

50.     Throughout the Commonwealth of Virginia, LogistiCare administers over four million trips for Medicaid beneficiaries.

51.     Before accepting Virginia Medicaid, Defendants, and all providers who submit claims for services provided to Medicaid beneficiaries, must certify that they will operate in accordance with the requirements established by HHS.

52.     At all times herein mentioned, Defendants had knowledge of the public policies expressed in the laws and regulations herein mentioned and of the fact that they must comply with all applicable State and Federal laws in order for the services Defendants perform to be approved for coverage under Medicaid.

## FACTUAL ALLEGATIONS

### I.  Overview

53.     Defendants operate a successful Medicare-certified medical transport company.

54.     Defendant's medical transport company is one of Virginia's largest medical transport providers today.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
10

55.     Business for Defendants slowed down subsequent to them losing contracts, including contracts with Bon Secours Sisters and HVA Virginia that Defendants lost to American Medical Response.

56.     The fraudulent payments Defendants' collect from Medicare and Medicaid consequently help defray their losses from the lost contracts and additional expenses they incurred in 2015 and 2016.

57.     Defendants acquired another medical transport company in 2015 called Eagle Medical Transport, gave their employees raises on October 1, 2016, bought new trucks and equipment, renovated their headquarters, and built an entirely new building next to their headquarters all within a relatively short period of time.

58.     Defendants are engaged in four fraudulent Medicare and Medicaid schemes:

   a.  Defendants submit false claims to Medicare and Medicaid for medical transports of patients that never happened;

   b.  Defendants submit false claims to Medicare and Medicaid for medically unnecessary medical transports of patients; and

   c.  Defendants overcharge Medicare and Medicaid for services provided patients.

59.     In furtherance of their fraudulent schemes, Defendants keep false records to support the false claims they submit to Medicare and Medicaid for payment while neglecting to complete other required paperwork.

60.     Defendants also threaten emergency medical technicians ("EMT"), including Whitaker, with retaliation if they do not cooperate with their fraudulent scheme.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
11

## II. Scheme 1: Defendants submit false claims to Medicare and Medicaid for medical transports of patients that never happened

61. Medicare does not pay claims for the medical transport of a beneficiary that does not occur, yet Defendants submit claims to Medicare, as well as Medicaid, for payment of medical transports of patients that never happened.

62. EMTs must complete "run reports" electronically for all medical transports of patients with patient information, the pick-up and drop-off location, mileage, a narrative about the transport, and signatures.

63. Defendants subsequently submit claims to Medicare and Medicaid for payment of the medical transports of patients.

64. Supervisors who work for Defendants instruct EMTs to complete and backdate run reports for medical transports of patients that never happened.

65. Defendants subsequently submit false claims to Medicare and Medicaid for payment of those medical transports of patients that never happened.

66. Supervisors who work for Defendants threaten EMTs who do not cooperate with discipline, including withholding paychecks and revoking their EMT certification.

67. On or around January 26, 2017, Karen Bergdoll, under the direction of Thomas McGowan, split up Whitaker from her medical transport partner after they refused to cooperate and has since been paired up with another medical transport partner who does cooperate.

68. EMTS have completed and backdated hundreds of run reports for medical transports of patients that never happened.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
12

69.     Karen Bergdoll, Thomas McGowan, and/or Wesley Melson, supervisors working for Defendants, instructed Whitaker to complete a false run report, number 64962, in 2017 for a 2016 medical transport of a patient that never happened.

70.     Whitaker created the created run report number 64962 on July 4, 2017, and backdated the report for 2016 using a start date of September 27, 2016, and end date of December 31, 2016, and listing Christopher Albert ("Albert") as one of the trip EMTs.

71.     Albert, an EMT who started working at LifeCare in October 2016, was not one of the trip EMTs for run report number 64962.

72.     Run report number 64962 was created for a medical transport of a patient that never happened.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
13



73.     Karen Bergdoll, Thomas McGowan, and/or Wesley Melson instructed Whitaker

to complete a false run report, number 72611, in 2017 for a 2016 medical transport of a patient

that never happened.

74.     Whitaker created the created run report number 72611 on July 4, 2017, and

backdated the report for 2016 using a start date of August 27, 2016, and end date of December

31, 2016, and listing Albert as one of the trip EMTs.

75.     Albert was not one of the trip EMTs for run report number 72611.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*

14

76. Run report number 72611 was created for a medical transport of a patient that never happened.



77. Karen Bergdoll, Thomas McGowan, and/or Wesley Melson instructed Whitaker to complete a false run report, number 73218, in 2017 for a 2016 medical transport of a patient that never happened.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
15

78.     Whitaker created the created run report number 73218 on July 4, 2017, and backdated the report for 2016 using a start date of July 27, 2016, and end date of December 31, 2016, and listing Albert as one of the trip EMTs.

79.     Albert was not one of the trip EMTs for run report number 73218.

80.     Run report number 73218 was created for a medical transport of a patient that never happened.



CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
16

81.     Karen Bergdoll, Thomas McGowan, and/or Wesley Melson instructed Whitaker to complete a false run report, number 74962, in 2017 for a 2016 medical transport of a patient that never happened.

82.     Whitaker created the created run report number 74962 on July 4, 2017, and backdated the report for 2016 using a start date of June 27, 2016, and end date of December 31, 2016, and listing Albert as one of the trip EMTs.

83.     Albert was not one of the trip EMTs for run report number 74962.

84.     Run report number 74962 was created for a medical transport of a patient that never happened.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
17



85.     On July 4, 2017, Whitaker sent a phone message to herself documenting that

Albert was not one of the trip EMTs for run report numbers 64962, 72611, 73218, or 74962 that

Karen Bergdoll, Thomas McGowan, and/or Wesley Melson instructed Whitaker to complete in

2017 for 2016 medical transports of patients that never happened.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
18



86.     In furtherance of the fraud, Defendants create false run reports and subsequently

submit false claims to Medicare and Medicaid for payment of medical transport of patient that

never happened using the names of past patients who Defendants provided medical transport.

87.     Wesley Melson, a supervisor working for Defendants falsified a run report,

number 42564, for the medical transport of a patient that never happened using the name of a

past patient, D.L., who Defendants provided medical transport.

88.     The information in the narrative of run report 42564 is also wrong, including

D.L.'s age, which is 20, not 55 as the narrative claims.



CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*

19

89.     In many cases supervisors who work for Defendants have EMTs complete false run reports for current patients needing frequent medical transport for routine care such as dialysis and wounded care patients.

90.     Dialysis patients require dialysis treatment three or four times a week at a hospital or dialysis center, and Defendants create false run reports and subsequently submit false claims to Medicare and Medicaid for payment of additional medical transports of dialysis patients that never happened.

91.     Wounded care patients have three or four appointments a week with healthcare providers, and Defendants create false run reports and subsequently submit false claims to Medicare and Medicaid for payment of additional medical transports of wounded care patients that never happened.

92.     In a phone message from Karen Bergdoll ("Bergdoll") to Whitaker and Joshua Williams ("Williams"), another EMT, on July 12, 2017, Bergdoll asked Whitaker to complete a run report, number 25181, for a medical transport of a patient Williams replied never happened.

93.     In Bergdoll's July 12, 2017, phone message to Whitaker and Williams, Bergdoll said, "I have an open EPCR that has not been done. 25181 from April 1. I don't know who the AIC was, but if ine [sic] of you could do it for me, Wesley and I appreciate it greatly. Thank you."

94.     In response to Bergdoll, Williams replied, "I have to fabricate vitals. . . . There's no information in the PCR as far as incident number or crew information. . . . It's entirely blank."

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
20





13:56
WED, JUL 12, 2017
Capture+
Wi-Fi
Sound
Bluetooth
Rotation
97%
Karen Bergdoll (8)
13:50
Subject: NoSubject
I have an open EPCR that has not been done. 25181 from April 1. I don't know who the AIC was, but if ine of you could do it for me, Wesley and I would appreciate it greatly. Thank you.
Subject: NoSubject
The farthest my list of PCRs goes is April 13
Subject: NoSubject
According to a filtered search that call doesn't exist on my profile

36%
14:03
Karen Bergdoll, Joshua Williams
2 people
Group Messaging
Joshua Williams
Subject: NoSubject
I found it. I have to fabricate vitals.
13:59
Lol I came in at the wrong end of this conversation....hey Karen I left a copy of my evoc at the office
14:02
Joshua Williams
Subject: NoSubject
There's no information in the PCR as far as incident number or crew information. Is this similar to when a call is placed on the CAD and given to another crew? It's entirely blank.
14:03

95.     After Whitaker and her colleagues complete false run reports, Defendants submit false claims to Medicare and Medicaid for payment of those medical transports of patients that never happened.

96.     In a June 7, 2017, audio recording, Whitaker's colleagues — Christopher Albert ("Albert"), Crista Jamieson ("Jamieson"), and Trevor Locus ("Locus") — discuss Defendants' unwarranted changes to run reports to justify medical transports.

97.     In the recording, one of Whitaker's colleagues said, "Everyone thinks they're double dealing."

98.     The same colleague of Whitaker also describes a run report consisting of "two sentences with misspelled words" and "the wrong patient's information on another patient's chart."

99.     In the recording, another colleague of Whitaker describes one of 19 medical transports for patients he was not on and that Thomas McGowan ("McGowan") told him "'I don't know how you got linked to that call.'"

100.     The same colleague of Whitaker also said he told McGowan "you guys are putting reports on us and it's not even mine." "They keep hassling me about this . . . report. I told Karen [Bergdoll] and Thomas [McGowan] that . . . I keep getting these . . . notifications . . . and emails that you need to finish this call and I'm like it's not my call."

101.     In the recording, one of Whitaker's colleagues said, "I found three calls and they had no crew members written on them at all."

102.     One of Whitaker's colleagues replied "That's the same with Cory [Riddle]. Cory had the same thing. . . . She's like 'you're just coming to me now from a call in October?' She's like 'I quit two months ago. You're hassling me now?'"

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker
v. LifeCare Medical Transports, Inc., et al.*
22

103.    The same colleague of Whitaker also said, "[I]f you look at your . . . runs, it has people on there I wasn't even on the truck with. Never been on the truck with. And you know you're only supposed to see the calls that you and your partner did for that day. I'm on the truck with Paul. Paul not even on the calls. It was me and Lee. And then there's another call with Karen and somebody else." "I never ran with Paul."

104.    One of Whitaker's colleagues replied "you never ran with Paul. I know!"

105.    In the recording, one of Whitaker's colleagues said, "I think it's funny that when you go to look up the [medical transports for patients] nothing pops up. You have to create the run and I'm like why do I have to create the run? I'm typing in the numbers and nothing's coming up. Obviously it's not mine."

106.    Another colleague of Whitaker replied "[o]bviously it's not a run if you have to create it." "That's not how it works."

107.    "Right, yeah, no," one of Whitaker's colleagues said in agreement.

108.    "That's how LifeCare works," a colleague of Whitaker stated. "I wonder how many other people that they doing this . . . . to."

109.    Another colleague of Whitaker claimed "They tried, they tried Bill." "Rob and I came across an accident months ago. This is like maybe October. Middle of October. Something like that. By [Virginia Interstate] 64. I had two patients. [T]hey just wanted to go get checked [and] had their two little kids with them. So yeah, obviously I'm on the phone with dispatch, you know, letting  them know what was going on and stuff. And she was like, well, I need everybody in the back of your ambulance's name. I'm like okay, fine. I said these are the two patients that are actually going in the hospital and then their kids are riding with us too. I . . .

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
23

get the reports. There's the two kids on there too. So the whole report I just . . . put not applicable and at the end I put not a patient."

110.    "Are they threatening to take your certifications?" one of Whitaker 's colleagues asked.

111.    "Yeah, yeah. They threatened to take hers," another colleague of Whitaker replied, later commenting that "what's crazy to me is that . . . you have a report and you don't do it, the . . . next business day they're calling you asking you about that . . . report. Why am I hearing about a report from . . . beginning of October?"

112.    "Months ago," one of Whitaker's colleagues added.

113.    Some of Whitaker's colleagues are members of a closed Facebook group and discussed the Defendants' unwarranted changes to run reports to justify medical transports that are billed to Medicare and Medicaid for payment.

114.    Members of the closed Facebook group include the following colleagues of Whitaker: Chiron Aldebaran ("Aldebaran"), Adam Bennett ("Bennett"), Susan Dietrich ("Dietrich"), Deborah Krug ("Krug"), Tommy Mackow ("Mackow"), Patrick Mason ("Mason"), Alex McNabb ("McNabb"), and Rick Thompson ("Thompson"),

115.    Wesley Melson ("Melson") is Defendants' Chief of Operations and also a member the EMTS closed Facebook group.

116.    On July 26, 2017, Mackow asked in a Facebook post whether "Anyone ever go back to copy their old narratives for a patient they've had before, and find that their narrative is completely different than what they actually typed, saved, and finalized?"

117.    EMTs replied to Mackow's Facebook post with their own posts:

   a.    Aldebaran: "Did your partner go in and change it?"

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker
v. LifeCare Medical Transports, Inc., et al.*
24

b.  Mackow: "Nope. I have consistent partners who'd never bother to do that."

c.  Mason: "Once finalized it can't be changed by anyone at [LifeCare]."

d.  Thompson: "Calls can be unfinalized. It was done for me recently when I found my call finalized by someone else with a 2-sentence narrative I didn't write."

e.  Mackow: "Rick Chittick Thompson ugh that is some trifling, reprehensible shit."

f.  Mason: "If I find a narrative of mine tampered with I am going to be really upset. Like dept of health investigation upset. That's illegal to change my report."

g.  Bennett: "Patrick Mason yes they can do it they been able to do it since they started with had it done to mine atleast 3 times."

h.  Mackow: "That'd make sense if someone were simply editing details in my narratives -- but it's more like TraumaSoft's going glitching and switching in narratives that I've entered for completely different patients. I've seen it happen maybe 5 times."

i.  Mason: "I stand corrected. I was told only an addendum could be added."

j.  Melson: "A very few have permission to unfinalize someone elses report. Again, it would all show in the history. Most area managers do NOT have access, thus the reason for an addendum which is the best way of noting changes."

k.  Mackow: "I'd argue that it's not a manager or anyone with access making the changes I'm taking about -- but major glitches on the part of TraumaSoft. I literally just looked back at the narrative in question, and /it is back to what it should be/. I promise that this isn't due to err on my part either. I searched the [patient] by name."

l.  Dietrich: "I've struggled myself."

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
25

m. McNabb: "Depending on what's going on here and the nature of the narratives being changed, this is a huge liability."



CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
26



Like · Reply · 22 hrs

**Tommy Lee Mackow** Nope. I have consistent partners who'd never bother to do that.

Like · Reply · 22 hrs

Write a reply...

**Patrick Mason** Once finalized it can't be changed by anyone at LC, not on TS V2 or V3

Like · Reply · 22 hrs

**Rick Chittick Thompson** Calls can be unfinalized. It was done for me recently when I found my call finalized by someone else with a 2-sentence narrative I didn't write.

Like · Reply · 3 · 22 hrs

**Tommy Lee Mackow** Rick Chittick Thompson ugh that is some trifling, reprehensible shit

Like · Reply · 22 hrs

**Patrick Mason** If I find a narrative of mine tampered with I am going to be really upset. Like dept of health investigation upset. That's illegal to change my report or someone who wasn't caring for my pt to add anything. VA OEMS agrees.

Like · Reply · 2 · 20 hrs

Write a reply...

**Adam Bennett** Patrick Mason yes they can do it they been able to do it since they started with had it done to mine atleast 3 times

Like · Reply · 1 · 22 hrs

**Tommy Lee Mackow** That'd make sense if someone were simply editing details in my narratives -- but it's more like TraumaSoft's going glitching and switching in narratives that I've entered for completely different patients. I've seen it happen maybe 5 times.

Like · Reply · 22 hrs

**Patrick Mason** I stand corrected. I was told only an addendum could be added

Like · Reply · 20 hrs

View more replies



change my report or someone who wasn't caring for my pt to add anything. VA OEMS agrees.
Like · Reply · 🔵 2 · 20 hrs

Write a reply...

**Adam Bennett** Patrick Mason yes they can do it they been able to do it since they started with had it done to mine atleast 3 times
Like · Reply · 🔵 1 · 22 hrs

**Tommy Lee Mackow** That'd make sense if someone were simply editing details in my narratives -- but it's more like TraumaSoft's going glitching and switching in narratives that I've entered for completely different patients. I've seen it happen maybe 5 times.
Like · Reply · 22 hrs

**Patrick Mason** I stand corrected. I was told only an addendum could be added
Like · Reply · 20 hrs

**Wesley Melson** A very few have permission to unfinalize someone elses report. Again, it would all show in the history
Like · Reply · 🔵 2 · 20 hrs

**Wesley Melson** Most area managers do NOT have access, thus the reason for an addendum which is the best way of noting changes.
Like · Reply · 🔵 2 · 20 hrs · Edited

**Tommy Lee Mackow** I'd argue that it's not a manager or anyone with access making the changes I'm talking about -- but major glitches on the part of TraumaSoft. I literally just looked back at the narrative in question, and /it is back to what it should be/.

I promise that this isn't due to err on my part either. I searched the pt by name.
Like · Reply · 🔵 1 · 19 hrs

Write a reply

**Susan Dietrich** I've struggled myself
Like · Reply · 🔵 1 · 21 hrs

**Alex McNabb** Depending on what's going on here and the nature of the narratives being changed, this is a huge liability.
Like · Reply · 🔵 1 · 21 hrs

**Tommy Lee Mackow** Agreed -- exactly why I'm bringing it up

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker
v. LifeCare Medical Transports, Inc., et al.*
28

### III. Scheme 2: Defendants submit false claims to Medicare and Medicaid for medically unnecessary transports of patients

118.    Medicare only pays claims for the medical transport of beneficiaries that are medically necessary as defined by Medicare Benefit Policy Manual, Chapter 10 Section 20 or if they are bed-confined as defined by 42 C.F.R. § 410.40(d)(1)(i)–(iii) (2012).

119.    Nevertheless, Defendants also submit claims to Medicare, as well as Medicaid, for payment of medical transports provided patients who are not bed-confined and that are medically unnecessary, including dialysis and wounded care patients.

120.    Dialysis and wounded care patients require three or four treatments or appointments each week.

121.    Because dialysis and wounded care patients have complex medical conditions, it is easier to assert medical transport to their treatments or appointments are medically necessary or that they are bed-confined when they are not.

122.    In other words, just because dialysis and wounded care patients have complex medical conditions does not qualify them for medical transport.

123.    The medical transport of dialysis and wounded care patients is not proper if they are not bed-confined as defined by 42 C.F.R. § 410.40(d)(1)(i)–(iii) (2012) or if it is not medical necessity as defined by Medicare Benefit Policy Manual, Chapter 10 Section 20.

124.    Nevertheless, Defendants bill Medicare, as well as Medicaid, for the medical transport of dialysis and wounded care patients who are not bed-confined as defined in 42 C.F.R. § 410.40(d)(1)(i)–(iii) (2012) and are not medical necessity as defined by Medicare Benefit Policy Manual, Chapter 10 Section 20.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
29

125.    Defendants also bill Medicare and Medicaid for unnecessary medical transports provided for evening discharges from Mary Washington Hospital when patients are capable of taking cabs instead and for unnecessary medical transports so patients can run errands.

126.    On September 21, 2017, Defendants transported a patient to Walmart where the EMTs waited in the truck for approximately an hour while the patient shopped for groceries and picked up prescriptions.



CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
30

127.   Also in 2017, Defendants transported a patient to Four Eyes to pick up eyeglasses.

128.   The patient did not have a medical appointment or meet with an optometrist during this medical transport to Four Eyes.



129.   Further, Defendants keep false records in support of the false claims Defendants submit to Medicare and Medicaid for payment of medically unnecessary transports of patients.

130.   Medical transport companies must obtain a signed Physician Certification Statement for non-emergency medical transports from the Medicare beneficiary's attending

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
31

physician or authorized healthcare provider that certifies a transport is medically necessary,
which the providers must retain on file for a Medicare Administrative Contractor upon request.

131.    The Physician Certification Statement is used to assess, among other things,
whether the transport meets medical necessity, eligibility, coverage, benefit category, and other
criteria for payment.

132.    The Defendants' Physician Certification Statements are incomplete and/or signed
by unauthorized personnel from discharging facilities.

133.    To certify the patient's medical transport is medically necessary, Physician
Certification Statements must include the patient's medical condition.

134.    Nevertheless, the medical condition of patients is often missing from the
Defendants' Physician Certification Statements.

135.    Further, only physicians or authorized healthcare providers can sign Physician
Certification Statements, yet unauthorized healthcare providers sign the Defendants' Physician
Certification Statements.

136.    One Physician Certification Statement in Whitaker's possession that is dated July
13, 2017, for a medical transport of a patient named M.P. does not document M.P.'s medical
condition.

137.    M.P.'s July 13, 2017, Physician Certification Statement only makes a conclusory
claim that the discharging facility was "unable to transfer [M.P.] to [a wheelchair] post surgery."

138.    Because M.P.'s July 13, 2017, Physician Certification Statement does not
document M.P.'s medical condition, the medical transport for M.P. was not properly certified as
medically necessary.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
32

sports      Fax: 540-752-5194
on-Emergency Ambulance Services – v112016

NERAL INFORMATION

B.: _____   Medicare #: _____

Transport Date: 7/13/17   Origin: _____   Destination: _____

Closest appropriate facility? ☐ YES   ☐ NO   If no, why is transport to more distant facility required?
_____

☐ Hospital to hospital transfer: describe services needed at 2nd facility not available at 1st facility:
_____

### SECTION II – MEDICAL NECESSITY QUESTIONNAIRE

Ambulance Transportation is medically necessary only if other means of transport are contraindicated or would be potentially harmful to the patient. To meet this requirement, the patient must be either "bed confined" or suffer from a condition such that transport by means other than ambulance is contraindicated by the patient's condition The following questions must be answered by the medical professional signing below for this form to be valid:

1) Describe the MEDICAL CONDITION (physical and/or mental) of this patient AT THE TIME OF AMBULANCE TRANSPORT that requires the patient to be transported in an ambulance and why transport by other means is contraindicated by the patient's condition:
_____

2) Is this patient "bed confined" as defined below? ☐ Yes   ☐ No
To be "bed confined" the patient must satisfy all three of the following conditions:  (1) *unable* to get up from bed without assistance, AND (2) unable to ambulate; AND (3) *unable* to sit in a chair or wheelchair

3) Can this patient safely be transported by car or wheelchair van (i.e., seated during transport, without a medical attendant or monitoring?)   ☐ Yes   ☐ No

4) *In addition* to completing questions 1-3 above, please check any of the following conditions that apply*:
☐ Contractures   ☐ Non-healed fractures   ☐ Patient is confused   ☐ Patient is comatose
☐ Moderate/severe pain on movement ☐ Danger to self/other ☐ IV meds/fluids required ☐ Patient is combative
☐ Need or possible need for restraints   ☐ DVT requires elevation of a lower extremity   ☐ Medical attendant required
☐ Requires oxygen – unable to self administer   ☐ Special handling/isolation/infection control precautions required
☐ Unable to tolerate seated position ☐ Hemodynamic monitoring required enroute ☐ Unable to sit in a chair or wheelchair due to decubitus ulcers or other wounds  ☐ Cardiac monitoring required enroute ☐ Morbid obesity requires additional personnel/equipment to safely handle patient  ☐ Orthopedic device (backboard, halo, pins, traction, brace, wedge, etc.) requiring special handling during transport
☒ Other (specify) _Unable to transfer to w/c post Surgery_

### SECTION III – SIGNATURE OF PHYSICIAN OR HEALTHCARE PROFESSIONAL

I certify that the above information is true and correct based on my evaluation of this patient, and represent that the patient requires transport by ambulance and that other forms of transport are contraindicated. I understand that this information will be used by the Centers for Medicare and Medicaid Services (CMS) to support the determination of medical necessity for ambulance services, and I represent that I have personal knowledge of the patient's condition at the time of transport.

☐ **If this box is checked**, I also certify that the patient is physically or mentally incapable of signing the ambulance service's claim and that the institution with which I am affiliated has furnished care, services or assistance to the patient. My signature below is made on behalf of the patient pursuant to 42 CFR §424.36(b)(4). In accordance with 42 CFR §424.37, *the specific reason(s) that the patient is physically or mentally incapable of signing the claim form is as follows:*
_____

_Jackie McCoy, RN_
Signature of Physician* or Healthcare Professional          _____
                                                          Date Signed
                                           (For scheduled repetitive transport, this form is not valid for
                                            transports performed more than 60 days after this date).

*Printed Name and Credentials Healthcare Professional (MD, DO, RN, etc.)*
*Form must be signed only by patient's attending physician for scheduled, repetitive transports. For non-repetitive, unscheduled ambulance transports, if unable to obtain the signature of the attending physician, any of the following may sign (please check appropriate box below):

☐ Physician Assistant   ☐ Clinical Nurse Specialist ☐ Registered Nurse ☐ Nurse Practitioner   ☐ Discharge Planner

139.    Defendants require EMTs to scan and send or fax the Physician Certification

Statements for all non-emergency medical transports by the end of every EMT's shift to the

billing office.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker
v. LifeCare Medical Transports, Inc., et al.*
33

140.    Defendants complete incomplete Physician Certification Statements received by the EMTs with false information to certify medical transports of patients are medically necessary.

141.    Defendants possess and keep hundreds of falsified Physician Certification Statements in a lockbox.

### IV. Scheme 3: Defendants overcharge Medicare and Medicaid

142.    In addition to submitting false claims to Medicare and Medicare for payment of medically unnecessary transports and medical transports never provided patients, Defendants also upcode or upcharge claims it submits to Medicare and Medicaid for payment.

143.    Defendants provide medical transports to bariatric patients that are billed at higher rates for the use of lifting equipment, which requires the assistance of an additional EMT.

144.    Defendants bill Medicare and Medicaid for the higher rate even though Defendants do not provide the lifting equipment or the assistance of an additional EMT, risking the safety of the patient and EMTs.

### V.  Defendants fail to complete LogistiCare's required daily log

145.    LogistiCare, which manages and operates Virginia's Non-Emergency Medicaid Transportation service, requires medical transport companies to complete a daily log with information about each medical transport and the signature of each Virginia Medicaid beneficiary, or his or her representative, when the medical transport has been completed.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
34

**LogistiCare**

**Virginia Non-Emergency Transportation Trip  Log**
LogistiCare Solutions, LLC

| | | | | |
|---|---|---|---|---|
| **Provider Name:** | A = Taxi/Van /Ambulatory | | **Mail To:** LogistiCare Claims Department P.O. Box 248 Norton, VA 24273 | |
| | W = Wheelchair | **WEEK ENDING:** | | |
| **Provider ID:** | S = Ambulance | **Start Time from Base** | | |
| | VS = Stretcher Van | If the member was a Rider No Show, place a check in this column. | **Vehicle Number** ( List last six digits of the VIN ) | |
| **DRIVER'S NAME (as it appears on drivers license)** | | **Return Time to Base** | | |
| **ATTENDANT'S FULL NAME (as it appears on drivers license)** | | Actual number of wheelchairs, attendants, and children per trip. Document the number and indicator code: W=Wheelchair; A= Attendants; C=Children Example: 4 W or 1 A or 2 C | | |

| Date of Service | LogistiCare Job # A or B | Member's Name | A W S VS | RNS | Pick-up Time | Drop-Off Time | Will Call Time | Total Trip Mileage | Wait Time | Per Trip Billed Amount | Number of Attendants, Children or Wheelchair | Member's Signature or Attendant's Signature (if applicable) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | $ | | |
| | | | | | | | | | | $ | | |
| | | | | | | | | | | $ | | |
| | | | | | | | | | | $ | | |
| | | | | | | | | | | $ | | |
| | | | | | | | | | | $ | | |
| | | | | | | | | | | $ | | |
| | | | | | | | | | | $ | | |

**NOTE** Leg of transport =a leg of transport is the point of pick-up to the destination.  Example: Picking recipient us at residence and transporting to the doctor's office would be considered one leg; picking the recipient us at the doctor's office and transporting back to the residence would be considered the second leg of the trip. Each leg of the transport must be documented on separate lines.  A signature is required for each leg of the transport.  Pick-up and drop-off times must be documented and in military time.

**Driver's Comments:** _____

I understand that LogistiCare will verify the accuracy of the mileage being reported and I hereby certify the information herein is true, correct, and accurate

DRIVER'S/PROVIDER'S NAME (must print): _____   DRIVER'S/PROVIDER'S SIGNATURE: _____

ATTENDANT'S NAME (must print): _____   ATTENDANT'S SIGNATURE: _____

146.     Nevertheless, Defendants do not complete LogistiCare's required daily log.

147.     The other medical transport companies Whitaker worked for required her to fill out and complete LogistiCare's required daily log, yet Whitaker and her partners have never filled out or completed, and never been instructed to fill out or complete,  LogistiCare's required daily log while working for Defendants.

148.     Whitaker has never even heard of or seen LogistiCare's required daily log while working for Defendants.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker
v. LifeCare Medical Transports, Inc., et al.*
35

## VI. Defendants possess scienter

149.    As discussed more fully above, Bergdoll, a supervisor working for Defendants, sends Whitaker and other EMTs texts asking them to complete run reports for medical transports of patients that never happened and Defendants subsequently submit false claims to Medicare and Medicaid for payments of the medical transports of patients that never happened.

150.    Supervisors who work for Defendants threaten EMTs who do not cooperate with discipline, including withholding paychecks and revoking their EMT certification.

151.    As discussed more fully above, Melson, Defendants' Chief of Operations, was privy to messages posted in a closed Facebook group in which Whitaker's colleagues discussed Defendants' unwarranted changes to run reports to justify medical transports that are billed to Medicare and Medicaid for payment.

152.    Further, both Dillard and Wildman portray themselves as certified compliance officers.



CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
36

153.    If Dillard and Wildman are certified compliance officers, they know that they should Medicare does not provide coverage if the medical transport of a Medicare beneficiary does not occur and that they are therefore violating Medicare and Medicaid rules by completing run reports for medical transports of patients that never happened yet are billed to Medicare and Medicaid for payment.

154.    If Dillard and Wildman are not certified compliance officers, they are acting in deliberate ignorance or reckless disregard of the truth that they are violating Medicare and Medicaid rules by completing run reports for medical transports of patients that never happened yet are billed to Medicare and Medicaid for payment.

155.    If Dillard and Wildman are certified compliance officers, they know that Medicare and Medicaid only pay claims for medically necessary transports of patients and that they are therefore violating Medicare and Medicaid rules by providing patients medically unnecessary transports that are billed to Medicare and Medicaid for payment.

156.    If Dillard and Wildman are not certified compliance officers, they are acting in deliberate ignorance or reckless disregard of the truth that they are violating Medicare and Medicaid rules by providing patients medically unnecessary transports that are billed to Medicare and Medicaid for payment.

157.    If Dillard and Wildman are certified compliance officers, they know that Medical transport companies must obtain a signed Physician Certification Statement for non-emergency medical transports from the Medicare beneficiary's attending physician or authorized healthcare provider that certifies a transport is medically necessary and that their failure to do so is a violation of Medicare and Medicaid rules.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
37

158. If Dillard and Wildman are not certified compliance officers, they are acting in deliberate ignorance or reckless disregard of the truth that they are violating Medicare and Medicaid rules by failing to obtain a signed Physician Certification Statement for non-emergency medical transports from the Medicare beneficiary's attending physician or authorized healthcare provider that certifies a transport is medically necessary.

159. If Dillard and Wildman are certified compliance officers, they know that Medical transport companies are not allowed to upcode or upcharge Medicare and Medicaid for services provided patients and that they are therefore violating Medicare and Medicaid rules by billing Medicare and Medicaid for payment of additional services never provided bariatric patients.

160. If Dillard and Wildman are not certified compliance officers, they are acting in deliberate ignorance or reckless disregard of the truth that they are violating Medicare and Medicaid rules by billing Medicare and Medicaid for payment of additional services never provided bariatric patients.

161. If Dillard and Wildman are certified compliance officers, they know that LogistiCare requires medical transport companies to complete a daily log with information about each medical transport and the signature of each Virginia Medicaid beneficiary, or his or her representative, when the medical transport has been completed and that their failure to do so is a violation of LogistiCare requirements.

162. If Dillard and Wildman are not certified compliance officers, they are acting in deliberate ignorance or reckless disregard of the truth that they are violating LogistiCare requirements by failing to complete a daily log with information about each medical transport and the signature of each Virginia Medicaid beneficiary, or his or her representative, when the medical transport has been completed.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
38

## COUNT I: Federal False Claims Act Violations
### 31 U.S.C. § 3729(a)(1)(A)
**Medical Non-Necessity Claims**

163.    Relator Whitaker incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

164.    Medicare only pays medical transport companies for emergency and non-emergency medical transport of a beneficiary who is bed-confined and other methods of transportation contraindicated or if the medical transport is medically required.  42 C.F.R. § 410.40(d)(1) (2012).

165.    Medicare does not pay claims for the medical transport of a beneficiary that does not occur, yet Defendants submit claims to Medicare for payment of medical transports of patients that never happened.

166.    Medicare only pays claims for medically necessary transports of patients, yet Defendants also submit claims to Medicare for payment of medically unnecessary transports of patients.

167.    Defendant Dillard and Defendant Wildman possess scienter because they portray themselves as certified compliance officers.

168.    Defendants possess scienter because, Bergdoll, a supervisor working for Defendants, sends Whitaker and other EMTs texts asking them to complete run reports for medical transports of patients that never happened and Defendants subsequently submit false claims to Medicare for payments of the medical transports of patients that never happened.

169.    Defendants possess scienter because supervisors who work for Defendants threaten EMTs who do not cooperate with discipline, including withholding paychecks and revoking their EMT certification.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
39

170.    Defendants possess scienter because Defendants' Chief of Operations, Melson, was privy to messages posted in a closed Facebook group in which Whitaker's colleagues discussed Defendants' unwarranted changes to run reports to justify medical transports that are billed to Medicare for payment.

171.    The false claims for payment are material to the government's decision to pay. But-for Defendants' submission of false claims, the government would not have paid Defendants for medical transports of patients that never happened and medically unnecessary transports of patients.

172.    The false claims Defendants submitted to Medicare for payment are violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and have cost the United States Government and taxpayers millions of dollars.

## COUNT II:  Federal False Claims Act Violations
### 31 U.S.C. § 3729(a)(1)(B)
### Medical Non-Necessity Claims

173.    Relator Whitaker incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

174.    Any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment or approval is liable under the False Claims Act.

175.    EMTs must complete "run reports" electronically for all medical transports of patients with patient information, the pick-up and drop-off location, mileage, a narrative about the transport, and signatures.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
40

176.    Supervisors who work for Defendants instruct EMTs to complete and backdate run reports for medical transports of patients that never happened.

177.    Medical transport companies must obtain a signed Physician Certification Statement for non-emergency medical transports from the Medicare beneficiary's attending physician or authorized healthcare provider that certifies a transport is medically necessary, which the providers must retain on file for a Medicare Administrative Contractor upon request.

178.    The Defendants' Physician Certification Statements are signed by unauthorized personnel from discharging facilities and/or incomplete, which Defendants complete with false information to certify medical transports of patients are medically necessary.

179.    Defendant Dillard and Defendant Wildman possess scienter because they portray themselves as certified compliance officers.

180.    Defendants possess scienter because, Bergdoll, a supervisor working for Defendants, sends Whitaker and other EMTs texts asking them to complete run reports for medical transports of patients that never happened and Defendants subsequently submit false claims to Medicare for payments of the medical transports of patients that never happened.

181.    Defendants possess scienter because supervisors who work for Defendants threaten EMTs who do not cooperate with discipline, including withholding paychecks and revoking their EMT certification.

182.    Defendants possess scienter because Defendants' Chief of Operations, Melson, was privy to messages posted in a closed Facebook group in which Whitaker's colleagues discussed Defendants' unwarranted changes to run reports to justify medical transports that are billed to Medicare for payment.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
41

183.    The false records Defendants create are used to support false claims Defendants submit to Medicare for payment in violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(B), and have cost the United States Government and taxpayers millions of dollars.

### COUNT III:  Virginia False Claims Act Violations
### Va. Code Ann. § 8.01-216.3(A)(1)
### Medical Non-Necessity Claims

184.    Relator Whitaker incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

185.    Any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to any Commonwealth of Virginia employee, officer, or agent is liable to the Commonwealth of Virginia.

186.    Services must be medically necessary in order to properly bill the government for medical services, yet Defendants submit claims to Medicaid for payment of medically unnecessary transports of patients and medical transports of patients that never happened.

187.    Defendant Dillard and Defendant Wildman possess scienter because they portray themselves as certified compliance officers.

188.    Defendants possess scienter because, Bergdoll, a supervisor working for Defendants, sends Whitaker and other EMTs texts asking them to complete run reports for medical transports of patients that never happened and Defendants subsequently submit false claims to Medicare for payments of the medical transports of patients that never happened.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
42

189.    Defendants possess scienter because supervisors who work for Defendants threaten EMTs who do not cooperate with discipline, including withholding paychecks and revoking their EMT certification.

190.    Defendants possess scienter because Defendants' Chief of Operations, Melson, was privy to messages posted in a closed Facebook group in which Whitaker's colleagues discussed Defendants' unwarranted changes to run reports to justify medical transports that are billed to Medicare for payment.

191.    The false claims Defendants submit to Medicaid for payment are violations of the Virginia False Claims Act, Va. Code Ann. § 8.01-216.3(A)(1), and have cost the Commonwealth of Virginia and taxpayers millions of dollars.

## COUNT IV: Virginia False Claims Act Violations
### Va. Code Ann. § 8.01-216.3(A)(2)
### Medical Non-Necessity Claims

192.    Relator Whitaker incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

193.    Any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim presented to any Commonwealth of Virginia employee, officer, or agent is liable to the Commonwealth of Virginia.

194.    EMTs must complete "run reports" electronically for all medical transports of patients with patient information, the pick-up and drop-off location, mileage, a narrative about the transport, and signatures.

195.    Supervisors who work for Defendants instruct EMTs to complete and backdate run reports for medical transports of patients that never happened.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
43

196.    Medical transport companies must obtain a signed Physician Certification Statement for non-emergency medical transports from the Medicare beneficiary's attending physician or authorized healthcare provider that certifies a transport is medically necessary, which the providers must retain on file for a Medicare Administrative Contractor upon request.

197.    The Defendants' Physician Certification Statements are signed by unauthorized personnel from discharging facilities and/or incomplete, which Defendants complete with false information to certify medical transports of patients are medically necessary.

198.    Defendant Dillard and Defendant Wildman possess scienter because they portray themselves as certified compliance officers.

199.    Defendants possess scienter because, Bergdoll, a supervisor working for Defendants, sends Whitaker and other EMTs texts asking them to complete run reports for medical transports of patients that never happened and Defendants subsequently submit false claims to Medicare for payments of the medical transports of patients that never happened.

200.    Defendants possess scienter because supervisors who work for Defendants threaten EMTs who do not cooperate with discipline, including withholding paychecks and revoking their EMT certification.

201.    Defendants possess scienter because Defendants' Chief of Operations, Melson, was privy to messages posted in a closed Facebook group in which Whitaker's colleagues discussed Defendants' unwarranted changes to run reports to justify medical transports that are billed to Medicare for payment.

202.    The false records Defendants create are used to support false claims Defendants submit to Medicaid for payment in violation of the Virginia False Claims Act, Va. Code Ann. §

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker
v. LifeCare Medical Transports, Inc., et al.*
44

8.01-216.3(A)(1), and have cost the Commonwealth of Virginia and taxpayers millions of dollars.

## PRAYER FOR RELIEF

WHEREFORE, Relator Whitaker, acting on behalf of and in the name of the United States of America, and on her own behalf, prays that judgment will be entered against Defendants for violating the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as follows:

a.  That for violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(A)–(B), this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendants' unlawful business practices, plus the maximum allowable civil penalty for each act in violation of 31 U.S.C. §§ 3729, *et seq.*;

b.  That Relator Whitaker be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d),  including the costs and expenses of this action and reasonable attorneys' fees; and

c.  That the United States Government and Relator Whitaker receive all other relief, both in law and equity, to which they are reasonably entitled.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators Tirado and Snyder hereby demand a jury trial.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker
v. LifeCare Medical Transports, Inc., et al.*
45

November 20, 2017                      Respectfully Submitted,

_____

David L. Scher, Esq. (Bar No. 47634)
R. Scott Oswald, Esq. (Bar No. 41770)
Andrew M. Witko, Esq. (to be admitted *pro hac vice*)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
P: (202) 261-2803; F: (202) 261-2835
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com
awitko@employmentlawgroup.com
Attorneys for *Qui Tam* Plaintiff

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and Commonwealth of Virginia ex rel. Cassandra Whitaker*
*v. LifeCare Medical Transports, Inc., et al.*
46